UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| International Brotherhood of Teamsters, *Airline Division*; and Teamsters Local Union 970, | File No. 23-cv-633 (ECT/TNL) |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| Sun Country, Inc., *doing business as Sun Country Airlines*; and Sun Country Airlines Holdings, Inc., | |
| Defendants. | |

Dimitre James Petroff and Joshua D. McInerney, Wentz, McInerney, Peifer & Petroff, LLC, Columbus, OH; and Brendan D. Cummins, Cummins & Cummins, LLP, Minneapolis, MN, for Plaintiffs International Brotherhood of Teamsters and Teamsters Local Union 970.

Becky L. Kalas, FordHarrison LLP, Chicago, IL; Charles A. Roach, FordHarrison LLP, Minneapolis, MN; and Sarah P. Wimberly, FordHarrison LLP, Atlanta, GA, for Defendants Sun Country, Inc., and Sun Country Airlines Holdings, Inc.

In January 2023, Sun Country's fleet service employees unionized. Within a few weeks, Sun Country terminated two employees who participated in the unionization effort, citing unexcused absences as the justification. Plaintiffs, the employees' national and local union chapters, allege Sun Country terminated the employees in retaliation for their union support, thereby violating the Railway Labor Act (or "RLA"). Sun Country seeks partial dismissal, arguing the Union lacks associational standing to bring claims on the employees' behalf. The motion will be granted because the Union has not alleged injury to itself and lacks standing to assert claims on behalf of, and seek relief for, non-party employees.

I[1]

Plaintiffs International Brotherhood of Teamsters and Teamsters Local Union 970 (collectively "the Union") are a national labor organization and it's Minneapolis-based chartered affiliate. Compl. [ECF No. 1] ¶¶ 4–5. Defendants Sun Country, Inc., and Sun Country Airlines Holdings, Inc. (collectively, "Sun Country") are an airline and is its parent corporation, both based in Minneapolis. *Id.* ¶¶ 6–7.

After a "duly conducted election," the Union became "the exclusive representative for purposes of the RLA of the craft or class of Fleet Service Employees of Sun Country," on January 5, 2023. *Id.* ¶ 17.[2] Little about the election is alleged in the Complaint, but the Union provided the National Mediation Board certification as an exhibit to its brief. *See* ECF No. 49-1 (showing Sun Country fleet service employees voted in favor of Union representation). The facts—as presented in the Complaint—revolve around two former employees, Sylvester Oliver and Monique Crisp, who are not parties to the case.

Sylvester "Sly" Oliver worked for Sun Country from October 2021 until his termination on January 21, 2023. Compl. ¶ 8. He was a part-time ramp agent and, prior

---

[1] As explained in Part II, *infra*, Sun Country's standing challenge accepts the Complaint's factual allegations as true. This means the usual Rule 12(b)(6) standards apply. In accordance with these standards, the facts are drawn from the Complaint and documents embraced by it. *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).

[2] It doesn't matter to this motion, but the record leaves some uncertainty regarding the certification date. The Complaint alleges the Union was certified as the employees' representative on January 4, 2023. Compl. ¶ 17. But the certification document is dated January 5. *See* ECF No. 49-1. And the Union elsewhere refers to January 10 as being "five days after the Union election victory." Compl. ¶ 18; *see also* Answer [ECF No. 19] ¶ 17 (denying the Union was certified on January 4). The better guess is the Union was certified January 5, 2023.

2

to his termination, had not received any disciplinary or corrective action. *Id.* ¶¶ 13–14. Mr. Oliver was heavily involved in the effort to unionize Sun Country's fleet service employees and was open and vocal about his union support. *Id.* ¶¶ 15–16. On January 10, 2023, five days after certification, Mr. Oliver brought the Local 970 Chapter president to the terminal to visit with new union members. *Id.* ¶¶ 18–19. While there, Sun Country managers approached and directed Mr. Oliver and the Local 970 Chapter president to leave because they were "disrupting operations," and because the Chapter president was "not authorized on the premises." *Id.* ¶¶ 24–27. Ten days later, on January 20, Mr. Oliver called and notified his supervisor and a human resources representative that he would be out of work because his wife had undergone surgery. *Id.* ¶ 29. Mr. Oliver was terminated the next day. *Id.* ¶¶ 31–32. Mr. Oliver was told verbally that his termination was due to bringing an unauthorized person to the tarmac; Mr. Oliver was later informed in writing that he was "also terminat[ed]" for the January 20 absence. *Id.* ¶¶ 33, 35. The Union claims Oliver was terminated for his union support. *Id.* ¶ 36.

Ms. Crisp's story follows a similar path. She worked as a fleet service employee of Sun Country from February 2022 until her termination on February 2, 2023. *Id.* ¶ 9. Ms. Crisp was "instrumental" in organizing the union effort and was open about her union involvement and support. *Id.* ¶¶ 38–40. Among other activities, Ms. Crisp collected signed union authorization cards from fellow employees and posted pro-union videos in an employee group text chat where managers could see them. *Id.* ¶¶ 39–40. On January 23, about three weeks after the union vote, Ms. Crisp's supervisor told her during a staff meeting that Sun Country would have to "'crack down' on discipline," because of the

3

union. *Id.* ¶ 42. Ms. Crisp "stood up to" the supervisor in the meeting. *Id.* Around February 1, Ms. Crisp swapped shifts with a coworker, which the Complaint alleges was permissible under Sun Country rules. *Id.* ¶¶ 44–46. The coworker, however, did not cover Ms. Crisp's shift as agreed. *Id.* ¶ 47. When Ms. Crisp next tried to clock in for work, she found her timecard had been deactivated. *Id.* ¶ 48. In a letter dated February 2, 2023, Sun Country notified Ms. Crisp she had been terminated "due to attendance." *Id.* ¶ 51. Sun Country had previously been lenient about attendance-related discipline. *Id.* ¶¶ 42–43, 50–51. The Union claims Crisp was terminated for her union activity. *Id.* ¶ 52.[3]

The Union brought this case alleging Sun Country violated the RLA. *See id.* The Complaint includes six counts. In Counts One and Two, the Union alleges that Sun Country's termination of Mr. Oliver interfered with employees' rights to designate their choice of representative under 45 U.S.C. § 152, Third, and their rights to join, organize, or assist in organizing the labor union of their choice, in violation of § 152, Fourth. *Id.* ¶¶ 53–58. Counts Three and Four allege the same violations stemming from Ms. Crisp's termination. *Id.* ¶¶ 59–62. In Counts Five and Six, the Union alleges Sun Country implemented stricter work rules because of union support, in violation of 45 U.S.C. § 152, Third and Fourth. *Id.* ¶¶ 63–66. For relief, the Union seeks an extensive injunction prohibiting Sun Country from interfering with employees' collective bargaining rights, reinstatement of Mr. Oliver and Ms. Crisp's employment, a declaration that Sun Country

---

[3]   The Complaint also includes general allegations about non-party employees John and Jane Does. Compl. ¶ 10. Ten Does were allegedly discharged for engaging in lawful union activity. *Id.* Pursuant to a stipulation with Sun Country, the Union withdrew its claims concerning the Does. *See* Pls.' Mem. in Opp'n [ECF No. 48] at 5 n.1.

4

violated the RLA, compensatory and punitive damages, and attorneys' fees and costs. *Id.* at 17–21 ¶¶ A–O.

Sun Country moves for partial dismissal of the Complaint, arguing the Union lacks standing to bring claims on behalf of non-party employees. ECF No. 34; *see* Defs.' Mem. in Supp. [ECF No. 35] at 8. In its briefing, Sun Country did not identify which counts or claims—or which parts of the counts or claims—should be dismissed; rather, it argued the court should dismiss "Plaintiffs' claims brought on behalf of these . . . employees, leaving only the claims properly brought on behalf of Plaintiffs themselves." *Id.* at 1; *see also* Defs.' Reply Mem. [ECF No. 54] at 2 (same). At the hearing, however, Sun Country clarified that it seeks dismissal of Counts One through Four only.

II

Sun Country brings its motion under Federal Rule of Civil Procedure 12(h)(3). *See* ECF No. 34. Rule 12(h)(3) provides that a court must dismiss an action "if [it] determines at any time that it lacks subject-matter jurisdiction." Fed. R. Civ. P. 12(h)(3). "A motion to dismiss for lack of subject matter jurisdiction under Rule 12(h)(3) is governed by the standard of Rule 12(b)(1)." *Yaakov v. Varitronics, LLC*, 200 F. Supp. 3d 837, 839 (D. Minn. 2016) (citing *Hebert v. Winona Cnty.*, 111 F. Supp. 3d 970, 974 (D. Minn. 2015)).

A court reviewing a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) must first determine whether the movant is making a "facial" attack or a "factual" attack. *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015). Here, Sun Country advances a facial attack because its challenge accepts the Complaint's

5

allegations as true and relies only on materials that may appropriately be considered at the motion-to-dismiss stage. *See* Defs.' Mem. in Supp. at 2 n.1; *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). The Rule 12(b)(6) standards therefore govern Sun Country's motion. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citations omitted).

Under these familiar standards, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog*, 760 F.3d at 792 (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*

Plaintiffs' Exhibit A—the union election certification—is a document embraced by the pleadings whose authenticity is not questioned and may be considered at this stage. *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (explaining courts may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned" in resolving a 12(b)(6) motion) (citation omitted); *Osborn*, 918 F.2d at 729 n.6 (explaining Rule 12(b)(6) standards govern); *see also* Compl. ¶ 17 (referencing certification).

III

A

Sun Country challenges the Union's standing to assert claims for monetary relief on behalf of non-party employees. Defs.' Mem. in Supp. at 10–13. The Union responds that unions' authority to seek damages on behalf of their members is well established by case law. Pls.' Mem. in Opp'n at 20–22. The great weight of case law supports Sun Country.

"Federal jurisdiction is limited by Article III of the Constitution to cases or controversies; if a plaintiff lacks standing to sue, the district court has no subject-matter jurisdiction." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (quoting *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 958 (8th Cir. 2011)). To establish Article III standing, a plaintiff must allege facts showing it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "Standing under Article III to bring a claim in federal court is distinct from the merits of a claim," *Enter. Fin. Grp., Inc. v. Podhorn*, 930 F.3d 946, 950 (8th Cir. 2019), and "[i]t is crucial . . . not to conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action, for the concepts are not coextensive," *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009).

"Even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). To have standing on behalf of its members, the Union must demonstrate "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the union] seeks to

7

protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1128 (8th Cir. 2016) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see id.* at 1128–29 (citing *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (explaining that unless "Congress intended to abrogate" the "standing limitation" that "an association's action for damages running solely to its members [is] barred for want of the association's standing to sue," the limitation is "otherwise applicable")). The Supreme Court later elaborated that "the third prong of the associational standing test is best seen as focusing on these matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *Brown Grp.*, 517 U.S. at 557; *see also Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 729 n.10 (2010) (describing the associational standing test as having *two* necessary requirements); *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 565 (2020) (Sotomayor J., dissenting) ("All Article III requires is that a member 'would otherwise have standing to sue in their own right' and that 'the interests [the association] seeks to protect are germane to the organization's purpose.'" (quoting *Brown Grp.*, 517 U.S. at 553)). "Crucial to the inquiry under the third prong of the associational standing test is the type of relief that Plaintiffs seek." *Minneapolis Branch of NAACP v. City of Minneapolis*, No. 23-cv-1175 (NEB/DTS), 2024 WL 1886759, at *3 (D. Minn. Mar. 29, 2024) ("*NAACP*"). "While '"individual participation" is not normally necessary when an association seeks prospective or injunctive relief for its members,' it is typically

8

'required in an action for damages to an association's members.'" *Id.* (quoting *Brown Grp.*, 517 U.S. at 546); *see also Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) ("We know of no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members.").

In *Higgins*, the Eighth Circuit addressed whether a union had standing to bring an action under § 1983 and Missouri law on behalf of its members. 813 F.3d at 1127–28. There, the court applied the associational standing principles described above to resolve the issue. *Id.* at 1128 (first citing *Warth*, 422 U.S. at 511, and then citing *Hunt*, 432 U.S. at 343). The court found it "need not decide whether the union ha[d] satisfied the first and second prongs of *Hunt* because the union [could] not satisfy the third requirement," *i.e.*, that individual members' participation was unnecessary. *Id.* It found the union's compensatory damages claim was "peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Id.* (quoting *Warth*, 422 U.S. at 515–16). The district court's dismissal was affirmed. *Id.* at 1130.

The same analysis applies here: the individual fleet service employees' participation is necessary to the Union's compensatory damages claims. The type of relief sought is "crucial" to the inquiry, *NAACP*, 2024 WL 1886759, at *3, and the Union specifically seeks damages for and on behalf of individual members. The Union seeks "[a]n award of compensatory and punitive damages to all Discriminatees in the case of Sly Oliver, Monique Crisp, and all affected Discriminatees and/or fleet service employees," Compl. at 20–21, ¶ M, as well as reinstatement of Mr. Oliver and Ms. Crisp's employment, including their compensation and benefits, *id.* at 18, ¶ C. It follows that to prove those damages, Mr.

9

Oliver, Ms. Crisp, and other fleet service employees must present "peculiar" and "individualized" proof of their injuries. *Higgins*, 813 F.3d at 1128. Indeed, *all* the facts recounted in the Complaint's "Facts" section—restated nearly verbatim in the Union's brief, *see* Pls.' Mem. in Opp'n at 3–12—are about Mr. Oliver and Ms. Crisp, *see* Compl. ¶¶ 13–52, and the relief sought depends on those facts.

The Union's position on this issue is not persuasive. In its brief, it relied on *Independent Federation of Flight Attendants v. Trans World Airlines, Inc.*, 126 F.R.D. 560 (W.D. Mo. 1989) ("*IFFA*"), a decision resolving a union plaintiff's motion to compel document production. The court addressed the union's standing and other procedural issues before reaching the merits of the motion. *IFFA*, 126 F.R.D. at 560. The *IFFA* court found unions could pursue monetary claims on behalf of members, explaining that "*Warth* itself notes the power of Congress to confer special standing when public policy concerns so dictate." *Id.* at 561 (citing *Warth*, 422 U.S. at 500–01). *Warth* noted that "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules," *Warth*, 422 U.S. at 501, but the case did not note or create any "special standing" for unions or RLA violations. And *IFFA* has not been followed. It has been cited once in a footnote in an Eastern District of Pennsylvania case involving the same defendant. *See Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320, 1322 n.1 (N.D. Ill. 1991). The more recent cases from the Eighth Circuit—*Higgins* in particular—control.

The Union advanced a different argument at the hearing. There, it relied on *Brown Group* to argue that the *Warth* associational standing test's third element is practical rather than constitutional, meaning Article III does not bar the Union from seeking damages. The

10

Union's understanding of this element is correct, but this doesn't change the result here. The third element—that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit—requires practical consideration "of administrative convenience and efficiency." *Brown Grp.*, 517 U.S. at 557. Here, as a practical matter, Mr. Oliver and Ms. Crisp's participation is required. The extent of the injuries each sustained, the propriety of their terminations, and their pay and expected pay, for example, are all issues that would arise in discovery. It would be imprudent for the case to proceed without them. The Union does not meet the associational standing test's third element insofar as it seeks damages, and those claims for relief will be dismissed.

B

Sun Country also argues the Union lacks standing with respect to its claims for injunctive and declaratory relief. Defs.' Mem. in Supp. at 13–29. The Union claims it has statutory standing under the RLA to bring such claims. Pls.' Mem. in Opp'n at 14–20. Associational standing principles apply, and the motion will be granted because it requires non-party employees' individualized participation.

"An 'organization lacks standing to assert claims of injunctive relief on behalf of its members where "the fact and extent" of the injury that gives rise to the claims for injunctive relief "would require individualized proof," or where "the relief requested [would] require[] the participation of individual members in the lawsuit."'" *Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64 F.4th 932 (8th Cir. 2023) (quoting *Bano*, 361 F.3d at 714 (alterations in original).

11

The fact and extent of the injuries that give rise to the Union's injunctive-relief claims depend on individualized proof and require Mr. Oliver and Ms. Crisp's individual participation. The Union has claimed no damage to itself. The facts alleged in the Complaint are *all* based on Mr. Oliver and Ms. Crisp's terminations. The Union never alleges, plausibly or otherwise, that it or other of its members were injured by Mr. Oliver or Ms. Crisp's terminations or any other action taken by Sun Country. The Union might have alleged that Sun Country interfered with employees' choice of representatives in violation of 45 U.S.C. § 152, Third, or interfered with the employees' union organization efforts in violation of § 152, Fourth without individualized proof from Mr. Oliver and Ms. Crisp. Hypothetically, for example, the Union might allege that certain Sun Country managers harbored anti-union animus and sought to terminate pro-union employees. But the Union does not allege that; it hangs the case exclusively on two individuals, who—according to the Complaint—were terminated because of unexcused absences or other rule violations. And it seeks injunctive relief for Mr. Oliver and Ms. Crisp specifically. Compl. at 18 ¶ C (seeking "[d]eclaratory, preliminary, and permanent injunctive relief requiring [Sun Country] to immediately reinstate Sylvester Oliver [and] Monique Crisp . . . to their former positions of employment . . . ."). Without amending, it is difficult to understand how the Union could prove its case without relying on evidence regarding Mr. Oliver and Ms. Crisp's terminations, including their disciplinary history and absences.

At the hearing, the Union again relied on *Brown Group* to argue that it should be allowed to proceed considering the prudential character of the associational standing test's third element. But a close look at *Brown Group* reveals substantial dissimilarities between

the statutes at issue there and here. There, a union sued Brown Group for violation of the WARN Act: Brown Group purportedly did not give the statutorily required sixty days' notice of a plant closure. *Brown Grp.*, 517 U.S. at 545–46. The Supreme Court found the WARN Act provided liability "to 'each aggrieved employee' for backpay." *Id.* at 548. It further provided that "[a] person seeking to enforce such liability, *including a representative* of employees . . . aggrieved under paragraph (1) . . ., may sue either for such person or for other persons similarly situated, or both, [in an appropriate district court]." *Id.* at 548–49 (emphasis added) (alterations in original) (quoting 29 U.S.C. § 2104(a)(5)). And Congress "defined the 'representative' . . . as the employees' union." *Id.* at 548. Taken together, Congress gave unions the right to sue on behalf of their members for violations of the WARN Act, thus overriding the associational standing test's third (prudential) element. *Id.* at 558. The RLA contains no analogous provision.

*

Sun Country preemptively argues that the Union should not be permitted to amend the Complaint to add Oliver and Crisp; it contends the applicable limitations period has expired and amendment would be untimely. Defs.' Mem. in Supp. at 29–33. The Union, however, did not seek leave to amend, described no proposed amendments, and filed no proposed amended pleading as required by D. Minn. LR 15.1(b) (requiring a motion to amend along with "(1) a copy of the proposed amended pleading, and (2) a version of the proposed amended pleading that shows . . . how the proposed amended pleading differs from the operative pleading."). On this record, it is not feasible to determine the propriety of any proposed amendments.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Defendant's Partial Motion to Dismiss [ECF No. 34] is **GRANTED**.

2. Counts One through Four of the Complaint [ECF No. 1] are **DISMISSED without prejudice**.

Dated: October 15, 2024

s/ Eric C. Tostrud
Eric C. Tostrud
United States District Court